

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DARREN D. VITA,<br><br>*Defendant.* | Case No. 3:24CR**093**<br><br>18 U.S.C. § 1343<br>Wire Fraud<br>(Count 1)<br><br>18 U.S.C. § 1957<br>Engaging in Monetary Transaction in Property Derived from Specified Unlawful Activity<br>(Count 2)<br><br>Forfeiture Allegation |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

## GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise stated:

1. Defendant Darren D. Vita ("VITA") was a resident of the Richmond, Virginia metro area, residing within the Eastern District of Virginia.

2. VITA operated two Virginia limited liability companies—The Vita Group, LLC ("The Vita Group") and Methadano, LLC ("Methadano").

3. VITA registered The Vita Group with the Virginia State Corporation Commission (SCC) on November 2, 2012, with the name "Capitol Estate Strategies, LLC." VITA was listed as the registered agent in the Articles of Organization. VITA changed the name of this entity to The Vita Group on November 18, 2014, and listed himself as the "Manager" and "Member" on The Vita Group's filings with the Virginia SCC. VITA utilized various addresses for The Vita

Group's "principal office" in the entity's SCC filings; these addresses were within the Richmond metro area, and typically VITA's current personal residence. The Vita Group's registration became inactive on or about February 28, 2018.

4. VITA registered Methadano with the Virginia SCC on or about February 28, 2017. VITA listed The Vita Group as the registered agent for this entity in Methadano's Articles of Organization. VITA listed himself as the "Manager" of Methadano, and provided his current residential address (in Richmond) as both Methadano's principal office and that of The Vita Group (as registered agent). Methadano's registration became inactive on or about May 31, 2018.

5. Prior to the timeframe described in this Criminal Information, VITA was a registered investment advisor, but that registration expired no later than November of 2014. VITA had also previously registered as a securities broker with the Securities and Exchange Commission (SEC), but that registration expired no later than April of 2017.

6. VITA maintained bank accounts at several financial institutions, to include at Wells Fargo Bank, Charles Schwab Bank, and Woodforest National Bank.

   a. VITA maintained a Wells Fargo checking account (ending in -3758) in the name of The Vita Group.

   b. Vita maintained a Wells Fargo checking account (ending in -8116) in the name of Methadano, LLC.

   c. Vita maintained a personal Wells Fargo checking account (ending in -6365).

   d. Vita maintained a personal Wells Fargo savings account (ending in -5127).

   e. Vita maintained a personal Charles Schwab checking account (ending in -9592).

7. VITA maintained a brokerage (trading) account at Charles Schwab (ending in -1818).

## COUNT ONE
### (Wire Fraud)

8. The allegations contained in paragraphs 1 through 7 of this Information are realleged and incorporated as though set forth in full here.

9. Between in or about 2016 through in or about at least March 2021, in the Eastern District of Virginia and elsewhere, the defendant, DARREN D. VITA, devised a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purposes of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant, DARREN D. VITA, caused to be sent and delivered in interstate and foreign commerce via wire communication certain signs, signals, and writings, as set forth below.

### Object of the Scheme and Artifice to Defraud

10. The object of VITA's scheme and artifice to defraud was for VITA to fraudulently obtain funds from individuals and dissipate those funds on and for his own purposes.

### Ways, Manner, and Means

The ways, manner, and means by which VITA sought to execute the above-described scheme and artifice to defraud included the following.

11. VITA solicited individuals to invest money with him through his companies, The Vita Group and Methadano, LLC. In doing so, VITA made material misrepresentations to induce these individuals to invest money. The specific misrepresentations (and material omissions) that VITA made to potential and actual investors varied over time, but included the following:

    a. VITA described The Vita Group as a private investment fund that VITA personally managed for his family and friends.

3

      b. VITA represented that he was an experienced investment manager with a history of highly profitable investment returns.

      c. VITA told investors that their money would be used to trade securities.

      d. VITA did not inform investors that their money would be used for his own personal expenses.

      e. VITA provided investors with account statements that falsely purported to show that the individual's investment principal was intact (and typically, growing).

12. Over the course of the scheme and artifice to defraud, employing the misrepresentations and omissions described generally above, VITA obtained a total of more than $220,000 in investment funds from three separate investors, described further below.

**Victim 1**

13. Victim 1 and his spouse first met VITA in or around 2005. Victim 1 believed VITA's representations about VITA's qualifications—specifically, that VITA was a "bonded and insured" investment advisor—and later decided to hire VITA as his full-service financial advisor. In or about December of 2016, Victim 1 told VITA that Victim 1 and his spouse were interested in investing in the stock market. VITA told Victim 1 that VITA could invest Victim 1's funds through VITA's investment company, The Vita Group.

14. Victim 1 agreed to provide VITA with investment funds that VITA would maintain in a "holding account" while VITA deliberated on which stocks to purchase. Victim 1 provided VITA with $49,980 from Victim 1's annuity on VITA's advice, incurring a penalty to do so.

15. VITA deposited Victim 1's funds into The Vita Group's Wells Fargo checking account on or about December 2, 2016. Over the course of the next five weeks, VITA withdrew or expended the entirety of Victim 1's investment funds on personal expenditures, to include car

payments, ATM withdrawals, personal credit card payments, and a $22,000 transfer to VITA's personal Wells Fargo checking account. By January 17, 2016, VITA had spent the entirety of Victim 1's funds.

16. Operating on the understanding that his investment funds were being securely maintained in The Vita Group's holding account, Victim 1 subsequently provided VITA with two more tranches of investment funds. VITA deposited the first of these two investment tranches—a $25,000 check—into The Vita Group's Wells Fargo checking account on or about January 20, 2017. VITA deposited the second tranche—a $50,000 check—into Methadano's Wells Fargo account on or about March 6, 2017. VITA thereafter dissipated the entirety of Victim 1's investment funds on various personal expenditures.

17. Over the following three years, Victim 1 repeatedly inquired with VITA as to the whereabouts of Victim 1's investment funds. VITA never provided Victim 1 with the return of Victim 1's investment funds.

**Victim 2**

18. Victim 2 first met VITA in or around 2007 when she purchased an insurance policy from VITA. Victim 2 believed VITA's claims that he was a successful financial advisor, and following her husband's death, Victim 2 sought financial advice from VITA. VITA encouraged Victim 2 to invest $50,000 with Vita's company, Methadano.

19. VITA assured Victim 2 that this would be a "safe" investment, and that Victim 2 would be able to withdraw her funds at any time.

20. Victim 2 agreed to invest, and provided VITA with a $50,000 check for the purpose of purchasing stock in Methadano. VITA deposited Victim 2's check into Methadano's Wells Fargo checking account on or about May 5, 2017.

21. VITA thereafter withdrew the entirety of Victim 2's funds from the Methadano account, transferring all but $700 to The Vita Group's Wells Fargo checking account and VITA's personal Wells Fargo checking account (VITA withdrew the remainder of Victim 2's funds from the Methadano account in ATM transactions). Within two months of Victim 2's investment, VITA had spent the entirety of Victim 2's investment funds on personal transactions executed from these two accounts, to include car payments, ATM withdrawals, and payments to friends and family.

22. Between 2018 and 2020, VITA mailed Victim 2 several "account statements" that falsely purported to show that Victim 2's investment capital was intact and growing at a slow but steady rate. In truth, as VITA well knew, Victim 2's funds were gone.

23. In early 2020, Victim 2 informed VITA that she would need to withdraw some of her investment in order to pay for cancer treatments. VITA instructed Victim 2 to instead withdraw funds from Victim 2's account with another investment firm. When Victim 2 had exhausted the funds in this account, she again contacted VITA to request the return of her Methadano investment. VITA instructed Victim 2 that she should borrow against a rental property that she owned if Victim 2 needed funds. VITA also told Victim 2 (for the first time) that Victim 2 would incur "penalties" if Victim 2 withdrew funds from her Methadano investment.

24. In March of 2021, VITA eventually provided Victim 2 with a check drawn on VITA's personal Woodforest Bank account for $15,000.

**Victim 3**

25. Victim 3 first met VITA in high school, and became reacquainted with VITA in or around 2019. VITA described himself to Victim 3 as a licensed investment professional, with 20 years of experience in finance. Victim 3, who dabbled in investment strategy, invited VITA to join a Facebook group—"Investors Exchange"—that Victim 3 participated in with a small circle

of acquaintances.

26. VITA thereafter offered to assist Victim 3 with investing, ultimately providing Victim 3 with an "Investment Proposal 2020" from The Vita Group. The Investment Proposal promised a "100 – 150% return" of Victim 3's investment principal. VITA's Proposal further claimed that VITA utilized a "highly specialized investment methodology" that relied upon (*inter alia*) "nearly 72 different evaluation criteria," and which had produced an "actual investment return of 375%" over the previous year.

27. Victim 3, believing VITA to be a registered securities broker, agreed to invest with The Vita Group. Victim 3 thereafter transferred $25,000 from Victim 3's mother's brokerage account to VITA's Charles Schwab brokerage account on or about March 23, 2020, with the understanding that VITA would invest these funds in options trading.

28. VITA's Charles Schwab brokerage account records establish that VITA transferred more than $18,000 of Victim's 3's funds to VITA's personal Wells Fargo Checking account, and subsequently spent the entirety of those funds on personal expenditures, to include personal debit card purchases, ATM withdrawals, and car payments. Within three months, VITA had also lost the remainder of Victim 3's funds (that is, the approximate $6,000 that VITA had not transferred out of VITA's brokerage account) in unsuccessful trades.

29. On or about June 1, 2020, VITA sent Victim 3 an email with the subject line "Statement for June 1, 2020." In the body of the email, VITA asked Victim 3 to invest additional funds with The Vita Group, assuring Victim 3 that "we are doing very well so far." VITA attached to his email an "Asset Management Account Statement" that falsely purported to reflect that Victim 3's initial $25,000 investment had grown to more than $42,000. In truth, as VITA well knew, VITA had already spent or lost the entirety of Victim 3's money.

30. Believing VITA's representations, Victim 3 decided that same day (June 1) to invest a second time with The Vita Group, and transferred an additional $24,500 to VITA's Charles Schwab brokerage account (which on this date had a balance of $0.68).

31. VITA's Charles Schwab brokerage account records establish that VITA transferred approximately half of Victim's 3's funds to VITA's personal Charles Schwab Checking account, and subsequently spent the entirety of those funds on personal expenditures—to include ATM withdrawals, payments to family members, and personal credit card payments. Within two months, VITA had also lost the remainder of Victim 3's funds (that is, the approximate $12,000 that VITA had not transferred out of VITA's brokerage account) in unsuccessful trades.

32. On or about January 28, 2021, VITA sent Victim 3 an email with the subject line "Dec 31, 2020 Statement." The body of VITA's email explained to Victim 3 that while Victim 3's investment was coming "back from a large dip," VITA was "very happy with the invested positions now." VITA attached to this email another "Asset Management Account Statement" that falsely purported to show that Victim 3's investment fund balance stood at $51,098. In truth, as VITA well knew, VITA had months earlier spent or lost the entirety of Victim 3's money.

### Interstate Wiring

33. Beginning in or around 2016, and continuing through in or around at least March of 2021, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, for the purposes of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendant, DARREN D. VITA, caused to be sent and delivered in interstate and foreign commerce via wire communication the signs, signals, and writings set forth below.

| Date (on or about) | Interstate Wire Communication |
|---|---|
| 6/01/2020 | An email, sent from the Eastern District of Virginia by VITA, utilizing VITA's Microsoft-provided email account, to Victim 3's Comcast-provided email account, which Victim 3 received and accessed in the State of New Jersey. |

34.  As a result of the scheme and artifice to defraud, VITA fraudulently obtained and dissipated a total of $224,480 from the three investors described above.

(In violation of Title 18, United States Code, Section 1343).

## COUNT TWO
(Monetary Transaction with Property Derived from Specified Unlawful Activity)

35.  The allegations contained in paragraphs 1 through 34 are realleged and incorporated as though set forth in full here.

36.  On or about the date set forth below, in the Eastern District of Virginia, and within the jurisdiction of this Court, as well as elsewhere, the defendant, DARREN D. VITA, unlawfully and knowingly engaged and attempted to engage in a monetary transaction (as that term is defined in Title 18, United States Code, Section 1957(f)(1)) in criminally derived property of a value greater than $10,000.00, such funds having been derived from a specified unlawful activity (that is, Wire Fraud, in violation of Title 18, United States Code, Section 1343):

| Date (on or about) | Monetary Transaction |
|---|---|
| 6/1/2020 | A wire transfer of $24,500 from the Charles Schwab brokerage account of M.E. to the Charles Schwab brokerage account of DARREN D. VITA (account ending in -1818), resulting in the receipt by VITA of funds fraudulently obtained from Victim 3. |

(In violation of Title 18, United States Code, Section 1957).

## FORFEITURE

Pursuant to 32.2 of the Federal Rules of Criminal Procedure, as to Count One of this Criminal Information, the defendant, upon conviction, shall forfeit to the United States any property, real or personal, which constitutes or is derived from, proceeds traceable to the violation.

The defendant is further notified that, upon conviction of the offense listed in Count Two, he shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property.

The property subject to forfeiture includes but is not limited to: a money judgment in the amount of at least $224,480.00, which represents the proceeds that the defendant received from the offense in Count One.

If any property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(All in accordance with Title 18, United States Code, Sections 982(a)(1), 981(a)(1)(C), as incorporated by Title 28 United States Code, Section 2461(c), and Title 21 United States Code, Section 853(p).)

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
Thomas A. Garnett
Assistant United States Attorney